IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

| | | |
|---|---|---|
| ERIC EMERSON, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Circuit Civil Division |
| GIDEON T. HAYMAKER, CHARLES E. BAILES, III, JOHN D. COCHRAN, BRIAN P. GOLSON, THOMAS J. O'SHANE, RICHARD J. WALSH, and UNITED COMMUNITY BANKS, INC., | ) ) ) ) ) ) ) | Case No. _____ |
| Defendants. | ) ) ) | |

## CLASS REPRESENTATION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Eric Emerson ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction because this is an action for damages, which, in the aggregate, are in excess of $500,000.00 exclusive of interest, costs, and attorneys' fees.

2.    This Court has personal jurisdiction over each defendant named herein, and due process is satisfied, because defendants have, at all times relevant to this action, individually or through their agents, subsidiaries, parent, officers, directors, and/or representatives: (a) operated, conducted, engaged in or carried on a business venture and/or commercial activities in this State; (b) maintained an office or agency in this State; (c) committed common law violations within this

1

State related to the allegations made in this Complaint; and (d) caused injuries to Plaintiff and all similarly situated members of the Class (defined herein), which arose out of the actions, inactions, conduct, statements, or omissions complained of herein and which occurred in the State of Florida and Orange County. Further, all defendants have sufficient minimum contacts with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

3. Venue is proper, pursuant to Fla. Stat. § 47.051, in this Court because the Company is headquartered in Orange County, Florida and much of the conduct complained of herein and/or all causes of action took place or accrued in, or emanated from, Orange County, Florida.

## THE PARTIES

4. Plaintiff was at all times relevant hereto, a stockholder of Three Shores Bancorporation, Inc. ("Three Shores" or the "Company"). Plaintiff is a resident of Florida.

5. Defendant Gideon T. Haymaker ("Haymaker") is the founder and served as Chief Executive Officer ("CEO") and a director of the Company from its inception in 2006 until the close of the Transaction (defined below). As a result of the Transaction, Defendant Haymaker became United Community Banks, Inc. ("United") President for the State of Florida. Defendant Haymaker is a resident of Florida.

6. Defendant Charles E. Bailes, III ("Bailes") served as a director of the Company from its inception in 2006 until the close of the Transaction. Defendant Bailes is a resident of Florida.

7. Defendant John D. Cochran ("Cochran") served as a director of the Company from 2009 until the close of the Transaction. Defendant Cochran is a Partner at Lovell Minnick Partners LLC ("Lovell Minnick"), an independent investment firm which provides buyout and growth capital to developing companies in the global financial services industry. Lovell Minnick is

affiliated with LM-SNBT, LLC, which will receive $3,819,165 in cash-out payments for its follow-on rights in connection with the Transaction.

8.    Defendant Brian P. Golson ("Golson") served as a director of the Company from 2009 until the close of the Transaction.  Defendant Golson is a Managing Partner and Co-CEO of Parthenon Capital Partners ("Parthenon"), a leading mid-market private equity firm based in Boston and San Francisco.  Parthenon is affiliated with PCAP-SNBT LLC, PCAP Associates-SNBT LLC, and J&R Founders-SNBT LLC, which will receive $3,819,165 in cash-out payments for its follow-on rights in connection with the Transaction.

9.    Defendant Thomas J. O'Shane ("O'Shane") was Chairman of the Board and served as a director of the Company from its inception in 2006 until the close of the Transaction.

10.   Defendant Richard J. Walsh ("Walsh") served as a director of the Company until the close of the Transaction.  Defendant Walsh is a resident of Florida.

11.   Defendants set forth in paragraphs 5 through 10 are referred to herein as the "Board" or the "Individual Defendants."   By virtue of their positions as directors or officers of the Company, the Individual Defendants were in a fiduciary relationship with Plaintiff and the other stockholders of Three Shores.

12.   Defendant United is a Georgia corporation with its principal executive offices located at 125 Highway 515 East, Blairsville, Georgia 30512.  United's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "UCBI."  Defendant United is sued herein as an aider and abettor.

**RELEVANT NON-PARTY**

13. Three Shores was a Florida corporation with its principal executive offices located at 201 South Orange Avenue, Suite 1350, Orlando, Florida 32801. Prior to the Transaction, the Company's common stock traded on the OTC Markets under the ticker symbol "TSHR."

**INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES AND
THE "ENTIRE FAIRNESS" STANDARD**

14. By reason of the Individual Defendants' positions as officers and/or directors of the Company, they were in a fiduciary relationship with Plaintiff and the other common stockholders of Three Shores, and had an obligation to act in utmost good faith and with undivided loyalty, independence, or due care to Plaintiff and the other members of the Class, as well as the Company. *See*, Fla. Stat. § 607.0830.

15. In accordance with their duties to act in utmost good faith and with undivided loyalty, independence, or due care, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors had an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's stockholders and, if such transaction would result in a change of corporate control, the stockholders were entitled to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants could not take any action that:

(a)    favored themselves or would discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(b)    adversely affected their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; and/or

(c)    would provide the Individual Defendants with preferential treatment at the expense of, or separate from, the common stockholders.

4

16.   In accordance with their duties of loyalty and good faith, the Individual Defendants were obligated to refrain from:

(a)   participating in any transaction where the Individual Defendants' loyalties were divided;

(b)   participating in any transaction where the Individual Defendants received, or were entitled to receive, an improper personal benefit not equally shared by the common stockholders of the corporation; and

(c)   unjustly enriching themselves at the expense of, or to the detriment of, the common stockholders.

17.   The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The concept of fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

18.   The test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness.

19.   To demonstrate entire fairness, the defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties.  An entire fairness analysis then requires the jury and/or the Court to consider carefully how the Board discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.  Because the Company's officers and directors hold

significantly divergent interests from the common stockholders, the burden to prove the entire fairness of the Transaction will remain with defendants.

20. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Transaction, knowingly or recklessly violated their fiduciary duties, including their duties to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

## NATURE AND SUMMARY OF THE ACTION

21. This is a stockholder class action brought by Plaintiff on behalf of himself and all other former common stockholders of Three Shores against the members of Three Shores' Board of Directors (the "Board" or "Individual Defendants") and United. This action arises out of defendants' breaches of their fiduciary duties owed to Plaintiff and other common stockholders of Three Shores or aiding and abetting thereof in connection with the acquisition of the Company by United, utilizing a materially incomplete proxy statement/prospectus on Form 424B3 (the "Proxy Statement") filed on May 12, 2020, with the U.S. Securities and Exchange Commission ("SEC") (the "Transaction").

22. Prior to the Transaction, Three Shores was the parent company of Seaside National Bank and Trust ("Seaside"), a nationally-chartered commercial bank headquartered in Orlando, Florida with fourteen branch locations in key Florida metro markets.

23. United, a Georgia corporation, is the parent company of United Community Bank ("United Community Bank").

24. On March 9, 2020, Three Shores and United issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated March 9, 2020 (the "Merger Agreement") to sell Three Shores to United. Pursuant to the terms of the Merger Agreement, each

outstanding share of Three Shores common stock ("Three Shores Common Stock") and Series D-1, Series D-2, Series D-3, and Series D-4 preferred stock (collectively, "Three Shores Series D Preferred Stock" and, together with the Three Shores Common Stock, "Three Shores Capital Stock") would be entitled to receive 0.33 shares of United common stock (the "Merger Consideration"). Based on United's closing stock price on July 1, 2020, the date of the close of the Transaction, the implied value of the Merger Consideration was $6.25 per share.

25. In addition to the United stock to be issued in the Transaction, United will pay approximately $25 million to extinguish all outstanding Three Shores options to acquire (or make follow-on investments in) Three Shores common stock.

26. On July 1, 2020, United announced it had completed its merger with Three Shores. Pursuant to the Merger Agreement, Seaside merged with United's bank subsidiary, United Community Bank (the "Bank Merger"), with United Community Bank intending to continue to operate the Seaside locations using the Seaside brand.

27. As a result of the Transaction, United stockholders hold approximately 90.4%, and former Three Shores stockholders hold approximately 9.6%, of the shares of the combined company.

28. As described below, both the value to Three Shores stockholders from the Transaction and the process by which defendants consummated the Transaction are fundamentally unfair to Plaintiff and the other stockholders of the Company. The Transaction was designed to ensure the sale of Three Shores to United on terms preferential to defendants and other Three Shores insiders and to subvert the interests of Plaintiff and the other stockholders of the Company.

29. Notably, from the Transaction, Three Shores' officers and directors received an additional ***$25 million*** in special cash payments – not made to Plaintiff and other former

stockholders of Three Shores – for vested and unvested stock options and follow-on rights. Critically, while Three Shores' public stockholders were forced to take United stock that decreased in value from $23.15 on March 6, 2020, the last trading day before the parties entered into the Merger Agreement to $18.67 on July 1, 2020, the date of the stockholder vote on the Transaction, members of the Board, Company management and certain entities affiliated with Three Shores Board members received *all cash* for their vested and unvested stock options and follow-on rights, that was not affected by the decrease in United's stock price.

30. Additionally, each of defendant Haymaker (Three Shores' Founder, CEO and director), Steven D. Hayworth (Three Shores' Vice Chairman and Director of Wealth Management), W. Timothy Myers (Three Shores' Regional President), Barry R. Griffiths (Three Shores' Senior Vice President and Chief Financial Officer), and Nancy K. Elberg (Three Shores' Director of Human Capital), received lump sums of approximately $1,765,635, $590,685, $327,421, $297,604, and $218,110, respectively, in "single-trigger" change-of-control payments.

31. All told, the Board and Company management collectively received over ***$27.9 million in personal benefits***.  Thus, Board members are conflicted and served their own financial interests rather than those of Three Shores' other stockholders.

32. Moreover, defendant Haymaker has entered into an employment agreement with United Community Bank for a term of two years (unless extended) commencing with the closing of the Merger and pursuant to which he will serve as President, Florida and Director of Private Banking and Wealth Management.  Through his employment agreement with United Community Bank, defendant Haymaker is: (i) entitled to an annual salary of $590,000 and eligible to receive a discretionary performance bonus, with a target rate of 25% of base salary; (ii) eligible to receive equity grants under United Community Bank's stock option plans as well as restricted stock units

under its equity plan equal to $500,000 on the date of grant; and (iii) eligible to receive consideration for annual equity grants at a target rate of 30% of his base salary, among other terms.

33. As a result of these conflicts, the process leading to the Transaction was flawed and favored the interests of the Board, Company management, certain entities affiliated with Three Shores Board members and United and constitutes a breach of fiduciary duties owed to Plaintiff and the Class.

34. For example, on December 11, 2019, United provided an indication of interest for an all-stock merger transaction at an implied price of $10.00 per share of Three Shores common stock. Then, on February 20, 2020, United submitted a revised indication of interest reflecting a fixed exchange ratio of 0.33 shares of United common stock for each share of Three Shores common stock, representing a decreased implied price of $9.74 per Three Shores share. In addition, this revised offer dangled the opportunity to *cash out options and follow-on rights at $10.00 per option and follow-on right*. Enticed by these improper personal benefits, rather than attempt to negotiate a higher price for the Company's public stockholders, the Board members accepted the decreased consideration set forth in United's February 20, 2020 indication of interest.

35. This flawed and conflicted process resulted in an unfair price for Three Shores' public stockholders. The Merger Consideration drastically undervalued the Company and its prospects. First, based on the March 6, 2020 closing price of United stock of $23.15, the last trading day before the deal was announced, the Transaction was valued at just $7.64 per Three Shores share, representing a significant discount to Three Shores' closing price of $9.22 on that same day. Additionally, the Board failed to negotiate for a fixed dollar value collar[1] on United's stock to lock

---

1 A fixed-dollar value collar is meant to protect the target company's assets, delivering a consistent dollar value for each of the seller's shares even if the acquiring company's stock price should drop.

in a floor value for the Merger Consideration, exposing Three Shores stockholders to a drop in United's stock price. Indeed, the implied value of the Merger Consideration dropped as low as $5.23 based on the closing price of United stock of $15.86 on May 13, 2020 and at the time of closing of the Transaction was $6.25.

36. As of May 6, 2020, directors and executive officers of Three Shores and their affiliates beneficially owned and were entitled to vote 9,192,195 shares of Three Shores common stock and 5,229,394 shares of Series D preferred stock, representing approximately 48.8% of the outstanding shares of Three Shores common stock and approximately 89.6% of the Three Shores Series D preferred stock entitled to vote on that date. A total of 10,099,916 shares of Three Shores common stock, representing approximately 53.6% of the outstanding shares of Three Shores common stock entitled to vote at the Three Shores special meeting, and a total of 5,834,542 shares of Three Shores Series D preferred stock, representing 100% of the outstanding shares of Three Shores Series D preferred stock entitled to vote at the Three Shores special meeting, are subject to voting and support agreements between United and the holders of such shares ("Voting and Support Agreements").

37. Pursuant to the Voting and Support Agreements, each such holder of Three Shores common stock and Three Shores Series D preferred stock agreed to vote their shares in favor of the Transaction and against any competing transaction.

38. In order to lock in the Transaction at the unfair Merger Consideration, the Board entered into numerous preclusive and onerous deal protection devices. These deal protection

---

The aim of the fixed-dollar value collar is to be a circuit breaker, which might forestall significant losses. By setting a floor on the stock component of an acquisition deal, the company doing the purchasing will commit to delivering a fixed-dollar value of its stock for each share of the company that is to be acquired.

devices diminished the chances of obtaining maximum value for the Company's stockholders and precluded any competing offers for the Company, and include: (i) a strict no-solicitation provision that prevented the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an "information rights" provision that required the Company to promptly advise United of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) a "matching rights" provision that allowed United four (4) business days to match any superior offer, plus an additional four (4) business days following any material revisions to a superior offer; and (iv) a provision requiring the Company to pay a termination fee of $8,500,000 if it decided to pursue a competing offer.

39. Thus, the Board compounded its breaches by, *inter alia*, agreeing to these unreasonable deal protection devices that precluded other bidders from making a successful competing offer for the Company.

40. The Voting and Support Agreements and the deal protection devices precluded a fair sales process for Three Shores' stockholders and made the Transaction a virtual *fait accompli*.

41. To make matters worse, and in an attempt to secure stockholder support for the unfair Transaction, on May 12, 2020, defendants caused to be filed the Proxy Statement with the SEC. The Proxy Statement, which recommended that Three Shores stockholders vote in favor of the Transaction, omitted or misrepresented material information concerning, among other things: (i) conflicts of interest faced by Company insiders; (ii) the background of the Transaction; (iii) Three Shores' and United's financial projections; and (iv) the data and inputs underlying the valuation analyses performed by the Company's financial advisor, Piper Sandler & Co. ("Piper Sandler"), in its financial analyses. Significantly, the Proxy Statement provided ***no information*** about the

Board's negotiations resulting in the Board, Company management and certain entities affiliated with Board members – unlike Three Shores' public stockholders – being paid **all cash (approximately $25 million)** for their stock options and follow-on rights.

42.    The Proxy Statement was required to disclose all of the material facts necessary for a reasonable stockholder to make a fully informed voting decision on the Transaction. Corporate directors in Florida are required to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty both to the corporation they serve and to its stockholders. *See*, Fla. Stat. § 607.0830. This duty requires officers and directors to communicate principal facts relating to the business which ought to be in good faith made known to stockholders. As discussed herein, the Proxy Statement failed to include material information, and thus, the Individual Defendants breached their fiduciary duties owed to Plaintiff and the Class.

43.    Additionally, in pursuing the unlawful plan to sell Three Shores to United, each of the defendants violated applicable law by directly breaching his or her duties as a director and/or aiding and abetting the other defendants' breaches of their fiduciary duties to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty.

44.    On June 16, 2020, Three Shores stockholders, lacking knowledge of material information relating to the Transaction, voted to approve the Transaction.

45.    For these reasons and as set forth in detail herein, the Individual Defendants are liable for monetary damages pursuant to Fla. Stat. § 607.0831 and Plaintiff seeks to recover monetary damages resulting from the Individual Defendants' violations of their fiduciary duties owed to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

46.  Three Shores was a bank holding company that operated Seaside and its subsidiaries: Seaside Insurance and Seaside Capital Management, a registered investment adviser.

47.  Seaside is a nationally-chartered commercial bank headquartered in Orlando, Florida that operates in 14 cities located throughout North Florida, Central Florida, West Florida, South Florida, and the Greater Miami Area.

48.  Through its affiliated companies, Three Shores offered its clients a complete array of financial services including: private banking, commercial banking, wealth management, trust services, and insurance.

49.  As of December 31, 2019, Three Shores had total consolidated assets of $1.9 billion, total deposits of $1.5 billion, total loans of $1.4 billion and total stockholders' equity of $169 million.  Off balance sheet in its wealth management business, Company subsidiaries had $913.4 million of assets under advisement, of which $721.7 million is fully managed for the benefit of its clients.

50.  The Company recently recorded strong first quarter 2020 results.  According to the Company's first quarter 2020 report, first quarter 2020 after tax consolidated net earnings for Three Shores was $3.91 million, compared to $403,000 in the first quarter of 2019.  Tangible book value ("TBV") per share was $6.99, compared to $5.96 in the first quarter of 2019, which as defendant Haymaker commented, "represent an attractive 17.3% growth."

**The Inadequate Sale Process**

51.  The Transaction is the result of a fatally flawed process resulting in the inadequate Merger Consideration and constitutes a breach of fiduciary duties owed to Plaintiff and the Class.

In April 2017, Three Shores engaged Piper Sandler to advise the Board with respect to potential business combination transactions.

52. Thereafter, throughout the summer and fall of 2017, Three Shores' senior management, together with Piper Sandler, held introductory meetings with potential merger partners. During this time, defendant Haymaker entertained and met with several potential transaction partners.

53. Beginning in late 2017 through September 2019, Three Shores formally launched and engaged in outreach efforts to potential acquirers. Throughout this period, Three Shores entertained several overtures with a variety of transaction structures from a large Canadian bank and several large regional U.S. banks, including United. At least four parties entered into confidentiality agreements with Three Shores.

54. In mid-July 2019, United contacted defendant Haymaker directly in an effort to re-engage its earlier evaluation of Three Shores and resume discussions with respect to a possible transaction. Three Shores and United continued periodic discussions throughout the remainder of the summer and into the fall of 2019.

55. Conversations between Three Shores and United recommenced in November 2019. On December 11, 2019, United sent Three Shores an indication of interest, for an all-stock merger transaction at an implied price of $10.00 per share of Three Shores common stock.

56. Thereafter, on February 20, 2020, United submitted a revised indication of interest reflecting a fixed exchange ratio of 0.33 shares of United common stock for each share of Three Shores common stock, and a proposal to cash out options and follow-on rights at $10.00 per option and follow-on right. Based on the closing price of United common stock on February 20, 2020,

the revised offer reflected a downward adjustment to the offer price, representing an implied value of $9.74 per Three Shores share.

57. Throughout the remainder of February 2020 and into March 2020, the parties negotiated the definitive merger agreement.

58. On March 9, 2020, the Board met and Piper Sandler delivered its fairness opinion. Thereafter, the Board unanimously approved and adopted the Merger Agreement and the Transaction and determined to recommend that Three Shores stockholders approve the Merger Agreement. Thereafter, the parties executed the Merger Agreement.

**The Transaction**

59. On March 9, 2020, Three Shores and United issued a joint press release announcing the Transaction. The press release states, in relevant part:

> GREENVILLE, SC - March 9, 2020 - United Community Banks, Inc. (NASDAQ: UCBI) ("UCBI") and Three Shores Bancorporation, Inc. ("Three Shores") announced today a definitive agreement for UCBI to acquire Three Shores, including its wholly-owned subsidiary, Seaside National Bank & Trust ("Seaside").
>
> Headquartered in Orlando, Florida, Seaside is a premier commercial lender with a strong wealth management platform. Its high-touch customer service is delivered to high net worth individuals and middle-market businesses through a network of 14 branches located in key Florida metro markets. As of December 31, 2019, Seaside reported outstanding loans totaling approximately $1.4 billion, comprised of a diversified group of small business borrowers operating in multiple industries in Florida. Additionally, Seaside operates a wealth management platform with more than $900 million of client assets under advisement.
>
> Three Shores and Seaside were founded in 2006 by Gideon Haymaker, who continues to lead the company today as President and Chief Executive Officer. In Mr. Haymaker's prior experience, he served as Executive Vice President of Private Client Services for SunTrust Banks for the State of Florida. Overall, he has more than 38 years of executive experience in regional banking. Following completion of the acquisition, Mr. Haymaker will become a key part of United's team and continue to lead the Florida market.
>
> * * *
>
> The transaction value is estimated to total approximately $180 million, including

approximately $25 million being paid to holders of options and follow-on rights to acquire Three Shores common stock. The stock portion of the merger consideration is based upon .3300 shares of UCBI common stock being issued in exchange for each share of Three Shores common stock. The acquisition is expected to be accretive to UCBI's earnings per share by approximately $0.12 to $0.14 in the first full year of operations and is consistent with UCBI's stated acquisition criteria pertaining to tangible book value and targeted internal rates of return. The transaction is expected to be completed in the third quarter of 2020 and is subject to customary conditions, including regulatory approval as well as the approval of Three Shores' shareholders.

**The Merger Consideration is Inadequate**

60.  The Transaction fails to adequately compensate Three Shores' stockholders for the intrinsic value of the Company as well as the significant benefits United would receive from the Merger and represents a breach of fiduciary duties owed to Plaintiff and the Class.

61.  Notably, on March 6, 2020, the last trading day before the announcement of the Transaction, Three Shores stock closed at $9.22, ***$1.58 above*** the $7.64 implied price of the Merger Consideration based on United's same day closing price of $23.15.

62.  Moreover, in the March 9, 2020 press release, United's Chairman and CEO Lynn Harton touted the substantial benefits United stands to gain from the Transaction, stating:

> This transaction is consistent with our commitment to grow our commercial lending business and to deepen our client offerings . . . . Our larger balance sheet and low cost funding brings capital needed to continue to grow Seaside's business and relationships. **Additionally, the financial returns Seaside adds the ability to supplement our traditional retail branch and commercial model with a "branch lite" C&I focus. of the transaction are not reliant on high cost savings or on revenue synergies. However, we do believe these opportunities will exist as we will be able to offer expanded products and services through our combined franchise.** The business will continue to be run by Seaside's experienced and proven management team, and our cultural compatibility and shared relationship-based approach makes this a great fit.

* * *

"I am excited to work with Gideon as we have developed a relationship over the past few years and have been looking for an opportunity to enter the Florida

markets. **This is an exceptional opportunity for us, and we look forward to what the future holds together.**

Emphasis added.

63.   Similarly, in the March 9 press release defendant Haymaker remarked, "I believe that the synergies that exist between our commercial lending businesses will result in tremendous success for both sides."

64.   Despite these strong synergies, the Board failed to secure a fair deal for the Company, either for the intrinsic value of its assets or the value of the Company's assets to United in a combined entity.

**The Board Impermissibly Locked Up the Transaction**

65.   The Merger Agreement features several provisions that worked to preclude other bidders from stepping forward with a superior alternative offer.   These provisions placed stockholders in an unfortunate position and question the impartiality of the Board members in the negotiation process and all of which represent a breach of fiduciary duties owed to Plaintiff and the Class.

66.   In a breach of their fiduciary duties owed to Plaintiff and the Class, the Individual Defendants agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevented Three Shores from soliciting, or its directors and officers from even participating in discussions that may lead to a superior proposal from any bidder (Merger Agreement, Section 6.3(a));

- An "information rights" provision that required the Company to advise United, within two business days, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.3(a));

- A highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Transaction under extremely limited circumstances, and a "matching rights" provision that allowed United four (4) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional four (4) business days following any material revisions to a superior offer (Merger Agreement, Section 6.3(b)); and

- A termination fee of $8,500,000 payable by the Company to United if Three Shores decided to pursue a competing bid (Merger Agreement, Section 8.3(a)).

67. The "no solicitation" clause, the "information rights" provision, the highly restrictive "fiduciary out," the "matching rights" provision, and the termination fee unfairly restrained the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

68. The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders created the very real potential that a third party bidder would attempt to usurp United and submit a higher bid for Three Shores. The possibility that a third-party bidder would emerge motivated United to "lock-up" the Transaction by co-opting the Board and forcing it to adopt unreasonable deal protection devices that would ensure that United could purchase the Company for less than would otherwise be possible.

**Insiders' Interests in the Transaction**

69. Three Shores insiders are the primary beneficiaries of the Transaction, not the Company's stockholders. The Company's directors and officers are conflicted and in breach of their fiduciary duties owed to Plaintiff and the Class because they received improper personal benefits from the Transaction not available to Plaintiff and the public stockholders of Three Shores.

70.   For example, while Three Shores' public stockholders lost control of the Company for inadequate consideration, Three Shores insiders reaped substantial financial benefits in connection with the Transaction.   Upon consummation of the Merger, Three Shores directors and officers received **cash payments** for all Company stock options, vested or unvested – an opportunity that would not otherwise be available.   The Merger Agreement provides that stock options awarded under the Three Shores equity plans would fully vest and be converted automatically into the right to receive a cash payment from Three Shores in an amount equal to the product of (i) the excess, if any, of $10.00 over the exercise price of each such stock option, multiplied by (ii) the number of shares of Three Shores common stock subject to the option.   The following table sets forth the payments made to the Three Shores and Seaside directors and executive officers in connection with their Company options:

| Name of Individual | Number of Options | Average Exercise Price | Cash-Out Payments |
|---|---|---|---|
| Gideon T. Haymaker | 1,260,000 | $5.33 | $5,880,000 |
| Thomas J. O'Shane | 61,000 | $5.87 | $ 252,010 |
| Richard J. Walsh | 51,000 | $5.94 | $ 207,010 |
| Charles E. Bailes III | 61,000 | $5.87 | $ 252,010 |
| John D. Cochran | 35,000 | $6.00 | $ 140,000 |
| Brian P. Golson | 35,000 | $6.00 | $ 140,000 |
| Michael Fess | 61,000 | $5.87 | $ 252,010 |
| Glen S. Davis | 56,000 | $5.88 | $ 230,760 |
| Jack T. Thompson | 35,000 | $6.00 | $ 140,000 |
| Steven D. Hayworth | 300,000 | $5.00 | $1,500,000 |
| Edmund C. Timberlake | 16,000 | $5.42 | $ 73,260 |
| Barry R. Griffiths | 60,000 | $5.33 | $ 280,500 |
| Gary P. Young | 38,000 | $5.06 | $ 187,755 |
| David E. Robinson | 3,400 | $5.57 | $ 15,050 |
| Total as a group | 2,072,400 | $5.39 | $9,550,369 |

71. Additionally, certain holders of Three Shores Series D preferred stock had contractual rights with Three Shores to make follow-on investments in Three Shores through

the purchase of additional shares of Three Shores capital stock. The Merger Agreement provides that at the effective time, each Three Shores follow-on right would be cancelled and converted automatically into the right to receive a cash payment from United in an amount equal to the product of the excess, if any, of $10.00 over $6.47. The following table sets forth the amounts paid to the holders of Three Shores follow-on rights:

| Name of Holder | Follow On Rights Dollar Amount | Exercise Price | Cash-Out Payments |
|---|---|---|---|
| PCAP-SNBT LLC, PCAP Associates-SNBT LLC, and J&R Founders-SNBT LLC | $ 7,000,000 | $6.47 | $ 3,819,165 |
| LM-SNBT, LLC | $ 7,000,000 | $6.47 | $ 3,819,165 |
| Continental Investors Fund LLC | $ 6,414,563 | $6.47 | $ 3,499,754 |
| Total as a group | $20,414,563 | $6.47 | $11,138,084 |

72. Notably, defendant Golson is Co-CEO and a Managing Partner of Parthenon, which is affiliated with PCAP-SNBT LLC, PCAP Associates-SNBT LLC, and J&R Founders-SNBT LLC and defendant Cochran is a Partner at Lovell Minnick, which is affiliated with LM-SNBT, LLC.

73. Moreover, defendant Haymaker has entered into an employment agreement with United Community Bank for a term of two years (unless extended) commencing with the closing of the Merger and pursuant to which he will serve as President, Florida and Director of Private Banking and Wealth Management. Through his employment agreement with United Community Bank, defendant Haymaker is: (i) entitled to an annual salary of $590,000 and is eligible to receive a discretionary performance bonus, with a target rate of 25% of base salary; (ii) eligible to receive equity grants under United Community Bank's stock option plans, and also will receive restricted stock units under its equity plan equal to $500,000 on the date of grant; and (iii) eligible to receive consideration for annual equity grants at a target rate of 30% of his base salary, among other terms.

74. Further, Three Shores entered into employment agreements with each of defendant Haymaker and other members of Company management including Steven D. Hayworth (Three Shores' Vice Chairman and Director of Wealth Management), W. Timothy Myers (Three Shores' Regional President), Barry R. Griffiths (Three Shores' Senior Vice President and Chief Financial Officer), and Nancy K. Elberg (Three Shores' Director of Human Capital), which provided for them to receive lump sum cash payments of approximately $1,765,635, $590,685, $327,421, $297,604, and $218,110, respectively, upon the closing of a change of control (which includes the Transaction).

75. The conflicts described above resulted in a process that led to: (i) the Board agreeing to sell the Company, rather than continuing to operate Three Shores as a growing and successful standalone business; (ii) an inferior Merger Consideration with an implied value below United's opening proposal; (iii) the Board not obtaining or even seeking a fixed dollar value collar on United's stock, which is the basis of the Merger Consideration; and (iv) the Board obtaining for itself, certain groups affiliated with Company directors and Company management **improper personal benefits, in the form of all cash consideration** for their options and follow-on rights.

**The Proxy Statement Omitted Material Information**

76. The defendants caused to be filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Three Shores' stockholders. Designed to convince stockholders to vote in favor of the Transaction, the Proxy Statement failed to provide Company stockholders with material information necessary for the Company's stockholders to make an informed voting decision in connection with the Transaction.

77. Specifically, as set forth below, the Proxy Statement failed to provide Company stockholders with material information or provided them with materially misleading information

concerning: (i) conflicts of interest faced by Company insiders; (ii) the background of the Transaction; (iii) Three Shores' and United's financial projections; and (iv) the data and inputs underlying the valuation analyses performed by the Company's financial advisor, Piper Sandler.

***Material Omissions Concerning Company Insiders' Conflicts of Interest***

78.  The Proxy Statement failed to disclose material information concerning the conflicts of interest faced by the Company's directors and executive officers.

79.  For example, the Proxy Statement set forth that, at the effective time of the merger, each outstanding Three Shores option to acquire (or outstanding right to make a follow-on investment in) Three Shores common stock will be cashed out. *See* Proxy Statement at 68.

80.  The Proxy Statement failed, however, to disclose the timing, nature and substance of all discussions or negotiations with respect to the cash out of Company options and follow-on rights.

81.  Additionally, the Proxy Statement set forth that defendant Haymaker has entered into an employment agreement with United Community Bank for a term of two years (unless extended) commencing with the closing of the Merger and pursuant to which he will serve as President, Florida and Director of Private Banking and Wealth Management and whereby he will be: (i) entitled to an annual salary of $590,000; (ii) eligible to receive a discretionary performance bonus, with a target rate of 25% of base salary; (iii) eligible to receive equity grants under United Community Bank's stock option plans; (iv) entitled to receive restricted stock units under its equity plan equal to $500,000 on the date of grant and with the vesting of such units if his employment continues through the second anniversary of the closing of the merger; (v) eligible to receive consideration for annual equity grants at a target rate of 30% of his base salary; (vi) entitled to reimbursement of reasonable business expenses incurred; and (vii) eligible to participate in the

medical, disability, life insurance and other plans applicable generally to employees of United Community Bank. *See id*. at 59.

82.  However, the Proxy Statement failed to disclose the timing, nature and substance of all employment-related discussions and negotiations that occurred between defendant Haymaker and United's executive officers and directors, including who participated in all such communications, when they occurred, and their content, as well as whether any of United's proposals or indications of interest mentioned defendant Haymaker's retention and employment with the combined company.

83.  Moreover, the Proxy Statement provided that:

> Three Shores has entered into employment agreements with each of Gideon T. Haymaker (President and Chief Executive Officer), Steven D. Hayworth (Vice Chairman and Director of Wealth Management), W. Timothy Myers (Regional President), Barry R. Griffiths (Senior Vice President and Chief Financial Officer), and Nancy K. Elberg (Director of Human Capital), ***which provide for them to receive upon the closing of a change of control (which includes the merger) lump sums of approximately $1,765,635, $590,685, $327,421, $297,604, and $218,110, respectively***.

*Id*. (emphasis added).  The Proxy Statement, however, failed to disclose any information about the timing, nature and substance of all discussions or negotiations that led to defendant Haymaker and certain members of Company management receiving lump sum cash payments in connection with the Transaction when Three Shores' public stockholders will only be receiving United shares.

84.  Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to shareholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

85.  Furthermore, the Proxy Statement failed to adequately disclose material information

concerning the Voting and Support Agreements. The Proxy Statement set forth that:

> [A] total of 10,099,916 shares of Three Shores common stock, representing approximately 53.6% of the outstanding shares of Three Shores common stock entitled to vote at the Three Shores special meeting, and a total of 5,834,542 shares of Three Shores Series D preferred stock, representing 100% of the outstanding shares of Three Shores Series D preferred stock entitled to vote at the Three Shores special meeting, are subject to voting and support agreements between United and the holders of such shares. Pursuant to the voting and support agreements, each such holder of Three Shores common stock and Three Shores Series D preferred stock has agreed to, among other things, vote their Three Shores common stock and Three Shores Series D preferred stock in favor of the Proposed Transaction, and against any competing transaction.

*Id*. at 33.

86. The Proxy Statement, however, failed to disclose the identities of the Three Shores' stockholders who were parties to the Voting and Support Agreements as well as the timing, nature and substance of all discussions or negotiations with United with respect to the Voting and Support Agreements entered into by the Company's directors and largest stockholders, representing approximately 53.6% of the Company's common stock.

87. Disclosure of this information was necessary for stockholders to understand the Board's potential conflict of interests as that information provides illumination concerning motivations that would prevent them from acting solely in the best interests of the Company's stockholders. A reasonable stockholder would want to know what important motivations that these directors and stockholders, who agreed to vote in favor of the Transaction, might have.

***Material Omissions Concerning the Background Process***

88. The Proxy Statement failed to disclose or misstated material information regarding the background process leading up to the Transaction.

89. The Proxy Statement failed to disclose whether the confidentiality agreements Three Shores entered into with four potential counterparties include "don't-ask, don't-waive" standstill

provisions, and if so, whether such standstill provisions precluded or limited the ability of the four potential counterparties from submitting alternative proposals or topping bids to acquire the Company.

90.   The disclosure of the terms of these confidentiality agreements was crucial to Three Shores stockholders being fully informed of whether their fiduciaries put in place restrictive devices to foreclose a topping bid for the Company.

91.   Additionally, the Proxy Statement failed to disclose whether the four parties that entered into confidentiality agreements with Three Shores submitted any proposals for an acquisition of the Company and, if so, the price terms contained in the proposals.

92.   Each of these omitted items was material to Three Shores' stockholders' ability to assess whether their fiduciaries instituted a process to secure the most favorable transaction for Three Shores stockholders.

***Material Omissions Concerning Three Shores' and United's Financial Projections***

93.   The Proxy Statement omitted material information regarding the Company's and United's financial projections provided by Three Shores' and United's respective management teams and relied upon by Piper Sandler for its financial analyses.

94.   With respect to Three Shores management's projections, the Proxy Statement failed to disclose the Company's TBV and earnings over the projection period.

95.   Similarly, with respect to United management's projections, the Proxy Statement failed to disclose United's TBV and earnings over the projection period and all line items underlying net income.

96.   This omitted information, if disclosed, would have significantly altered the total mix of information available to Three Shores' stockholders.

*Material Omissions Concerning Piper Sandler's Financial Analyses*

97.   The Proxy Statement described Piper Sandler's fairness opinion and the various valuation analyses performed in support of its opinion.   However, the description of Piper Sandler's fairness opinion and analyses failed to include key inputs and assumptions underlying these analyses.   Without this information, as described below, Three Shores' stockholders were unable to fully understand these analyses and, thus, unable to determine what weight, if any, to place on Piper Sandler's fairness opinion in determining whether to vote in favor of the Transaction.   This omitted information, if disclosed, would have significantly altered the total mix of information available to Three Shores' stockholders.

98.   With respect to Piper Sandler's *Net Present Value Analysis – Three Shores*, the Proxy Statement failed to disclose: (i) quantification of the financial metrics that 2024 earnings and 2024 TBV multiples were applied to in order to derive the terminal values; (ii) quantification of the estimated terminal values of the Company; and (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 11.0% to 15.0%.

99.   With respect to Piper Sandler's *Net Present Value Analysis – United*, the Proxy Statement failed to disclose: (i) quantification of the financial metrics that 2024 earnings and 2024 TBV multiples were applied to in order to derive the terminal values; (ii) quantification of the estimated terminal values of United; and (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 8.0% to 12.0%.

100. With respect to Piper Sandler's *Pro Forma Transaction Analysis*, the Proxy Statement failed to disclose and quantify the specific accretion to United's estimated earnings per share in the years ending 2020 through 2023 and dilution to United's estimated tangible book value per share at closing.

101. When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Without such undisclosed information, Three Shores stockholders could not evaluate for themselves whether the financial analyses performed by Piper Sandler were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Transaction. This information was therefore material, and Three Shores was required to disclose this information to its stockholders so that they could make a fully informed voting decision. That did not occur. Accordingly, the omission of this information rendered the statements made concerning Piper Sandler's analyses and opinion materially incomplete and represents a breach of fiduciary duties owed to Plaintiff and the Class.

102. Without full and fair disclosure of the material information set forth above, Three Shores Stockholders should not have been asked to vote on the Transaction.

## CLASS ACTION ALLEGATIONS

103. Plaintiff brings this action pursuant to Florida Rule of Civil Procedure 1.220, individually and on behalf of all holders of the common stock of Three Shores, and their successors in interest, who have been and will be harmed by the wrongful conduct of the defendants as alleged herein (the "Class"). The Class excludes defendants, and any person, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the defendants, as well as the immediate families of the defendants.

104. This action is properly maintainable as a class action.

105. The Class is so numerous that separate joinder of all members is impracticable. As of March 9, 2020, there were approximately 18,843,991 Three Shores common shares issued and

outstanding. Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

106. Questions of law and fact exist that are common to the Class, including, inter alia, the following:

(a)    whether the Individual Defendants have breached their fiduciary duties to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and the other members of the Class in connection with the Transaction;

(b)    whether the Individual Defendants engaged in self-dealing in connection with the Transaction;

(c)    whether the Individual Defendants derived an improper personal benefit, either directly or indirectly in connection with the Transaction;

(d)    whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(e)    whether the defendants failed to disclose material information to stockholders in connection with the Transaction; and

(f)    whether Plaintiff and the other members of the Class were injured by the wrongful conduct alleged herein and, if so, what is the proper measure of damages.

107. Plaintiff will fairly and adequately represent and protect the interests of the Class. Indeed, Plaintiff is committed to vigorously prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are also typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Moreover, Plaintiff's claims do not conflict with the interests of any other members of the

Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

108. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

109. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and caused injury to the entire Class, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**COUNT I**

**Claim for Breach of Fiduciary Duties**
**Against Gideon T. Haymaker**

110. Plaintiff repeats and realleges each and every allegation set forth herein.

111. As a member of the Company's Board, Haymaker had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

112. Haymaker breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests, receiving $7,645,000 in improper personal benefits in connection with the Transaction and negotiating his future employment with the combined company, and not for the best interests of Three Shores' common stockholders, (b) ignored or did not protect against the

numerous conflicts of interest resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores' common stockholders received adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including Haymaker, capped the price of Three Shores at a price that did not adequately reflect the Company's true value. Haymaker also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

113. Further, as a director of the Company Haymaker was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

114. By virtue of his position within the Company, Haymaker was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including Haymaker. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

115. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it

inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

116. By reason of the foregoing acts, practices and course of conduct, Haymaker failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

117. As a result of Haymaker's actions, Plaintiff and the members of the Class have suffered damages.

118. Wherefore, we demand judgment against Defendant Haymaker and special damages against Haymaker in the amount of $7,645,000 for the improper personal benefits he obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT II

### Claim for Breach of Fiduciary Duties
### Against Charles E. Bailes, III

119. Plaintiff repeats and realleges each and every allegation set forth herein.

120. As a member of the Company's Board, Bailes had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

121. Bailes breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests, receiving $252,010 in improper personal benefits in connection with the Transaction and not for the best interests of Three Shores' common stockholders, (b) ignored or

31

did not protect against the numerous conflicts of interest resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores' common stockholders received adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including Bailes, capped the price of Three Shores at a price that did not adequately reflect the Company's true value. Bailes also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

122. Further, as a director of the Company Bailes was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

123. By virtue of his position within the Company, Bailes was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including Bailes. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

124. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it

inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

125. By reason of the foregoing acts, practices and course of conduct, Bailes failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

126. As a result of Bailes' actions, Plaintiff and the members of the Class have suffered damages.

127. Wherefore, we demand Judgment against Defendant Bailes and special damages against Bailes in the amount of $252,010 for the improper personal benefits he obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT III

### Claim for Breach of Fiduciary Duties
### Against John D. Cochran

128. Plaintiff repeats and realleges each and every allegation set forth herein.

129. As a member of the Company's Board, Cochran had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

130. Cochran breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests and entities he is affiliated with interests, receiving $3,959,165 in improper personal benefits in connection with the Transaction and not for the best interests of Three Shores' common stockholders, (b) ignored or did not protect against the numerous conflicts of interest

resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores' common stockholders received adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including Cochran, capped the price of Three Shores at a price that did not adequately reflect the Company's true value. Cochran also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

131. Further, as a director of the Company, Cochran was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

132. By virtue of his position within the Company, Cochran was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including Cochran. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

133. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

134. By reason of the foregoing acts, practices and course of conduct, Cochran failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

135. As a result of Cochran's actions, Plaintiff and the members of the Class have suffered damages.

136. Wherefore, we demand Judgment against Defendant Cochran and special damages against Cochran in the amount of $3,959,165 for the improper personal benefits he and his affiliates obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT IV

**Claim for Breach of Fiduciary Duties**
**Against Brian P. Golson**

137. Plaintiff repeats and realleges each and every allegation set forth herein.

138. As a member of the Company's Board, Golson had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

139. Golson breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests and entities he is affiliated with interests, receiving $3,959,165 in improper personal benefits in connection with the Transaction and not for the best interests of Three Shores' common stockholders, (b) ignored or did not protect against the numerous conflicts of interest resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores'

common stockholders received adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including Golson, capped the price of Three Shores at a price that does not adequately reflect the Company's true value. Golson also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

140. Further, as a director of the Company Golson was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

141. By virtue of his position within the Company, Golson was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including Golson. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

142. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

143. By reason of the foregoing acts, practices and course of conduct, Golson failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

144. As a result of Golson's actions, Plaintiff and the members of the Class have suffered damages.

145. Wherefore, we demand Judgment against Defendant Golson and special damages against Golson in the amount of $3,959,165 for the improper personal benefits he and his affiliates obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT V

### Claim for Breach of Fiduciary Duties
### Against Thomas J. O'Shane

146. Plaintiff repeats and realleges each and every allegation set forth herein.

147. As a member of the Company's Board, O'Shane had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

148. O'Shane breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests, receiving $252,010 in improper personal benefits in connection with the Transaction and not for the best interests of Three Shores' common stockholders, (b) ignored or did not protect against the numerous conflicts of interest resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores' common stockholders received

37

adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including O'Shane, capped the price of Three Shores at a price that does not adequately reflect the Company's true value. The Individual Defendants also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

149. Further, as a director of the Company O'Shane was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

150. By virtue of his position within the Company, O'Shane was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including O'Shane. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

151. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

152. By reason of the foregoing acts, practices and course of conduct, O'Shane failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

153. As a result of O'Shane's actions, Plaintiff and the members of the Class have suffered damages.

154. Wherefore, we demand Judgment against Defendant O'Shane and special damages against O'Shane in the amount of $252,010 for the improper personal benefits he obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT VI

### Claim for Breach of Fiduciary Duties
### Against Richard J. Walsh

155. Plaintiff repeats and realleges each and every allegation set forth herein.

156. As a member of the Company's Board, Walsh had fiduciary obligations to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores.

157. Walsh breached his fiduciary duties to Plaintiff and the Class by failing to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty owed to Plaintiff and other common stockholders of Three Shores because, among other reasons, (a) he acted for his own interests, receiving $207,010 in improper personal benefits in connection with the Transaction and not for the best interests of Three Shores' common stockholders, (b) ignored or did not protect against the numerous conflicts of interest resulting from his own and other members of the Board's interrelationships or connection with the Transaction, and (c) failed to take reasonable steps to obtain and/or ensure that Three Shores' common stockholders received

adequate and fair value for their shares. In addition, by agreeing to the Transaction, the Individual Defendants, including Walsh, capped the price of Three Shores at a price that does not adequately reflect the Company's true value. Walsh also failed to sufficiently inform himself of Three Shores' value, or disregarded the true value of the Company.

158. Further, as a director of the Company Walsh was responsible for disseminating the materially misleading and incomplete information to the Company's common stockholders. The Individual Defendants had an obligation to be complete and accurate in their disclosures.

159. By virtue of his position within the Company, Walsh was aware of this information and of his duty as a director to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants, including Walsh. It misrepresented and/or omitted material facts, including material information about the conflicts of interest faced by Three Shores' insiders, the background leading to the Transaction, the Company's and United's projections and the financial analyses performed by Piper Sandler. Defendants' failure to provide full and fair disclosure, stripped Plaintiff and the Class of their ability to make an informed voting decision with respect to the Transaction, and damaged them.

160. Because the Individual Defendants dominate and control the business and corporate affairs of Three Shores, and are in possession of private corporate information concerning Three Shores' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the common stockholders of Three Shores which made it inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits to the detriment of Three Shores stockholders.

161. By reason of the foregoing acts, practices and course of conduct, Walsh failed to act with the utmost good faith, fairness, and honesty and with the highest and finest loyalty toward Plaintiff and the other members of the Class.

162. As a result of Walsh's actions, Plaintiff and the members of the Class have suffered damages.

163. Wherefore, we demand Judgment against Defendant Walsh and special damages against Haymaker in the amount of $207,010 for the improper personal benefits he obtained in connection with the Transaction, plus costs and pre-judgment interest on past due economic losses and for all other relief requested herein.

## COUNT VII

### Claim for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties Against United

164. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

165. Defendant United aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the common stockholders of the Company, including Plaintiff and the members of the Class.

166. The Individual Defendants owed to Plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

167. By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class.

168. Defendant United colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the other members of the Class.

169. Defendant United participated in the breach of the fiduciary duties by the Individual Defendants for the purpose of advancing their own interests. Defendant United obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Defendant United benefitted, *inter alia*, from the acquisition of the Company at an inadequate and unfair price.

170. Plaintiff and the members of the Class have no adequate remedy at law.

171. Wherefore, we demand Judgment against Defendant United for aiding and abetting the breaches of fiduciary duty of the Board.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and permanent relief, in his favor and in favor of the Class, and against the defendants as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.     Declaring that defendants have breached their fiduciary duties to Plaintiff and the Class and/or aided and abetted the breaches thereof;

C.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

D.     Directing that defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and improper personal benefits obtained as a result of their breaches of their fiduciary duties, including the difference between the standalone value of Three Shores and the inadequate Merger Consideration and that the ***$27.9 million in special cash payments*** the Board and Company management will collectively receive

in connection with the Transaction be distributed on a pro rata basis to Three Shores' common stockholders;

E.    Awarding Plaintiff fees and expenses in connection with this litigation, including reasonable attorneys' and experts' fees and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

Dated: August 11th , 2020                    **MOONEY COLVIN, P.L.**

By:  */s/ John V. Colvin*
_____
John V. Colvin (FBN 0963828)
1525 E. Amelia St.
Orlando, FL 32803
Tel: (407) 648-2889
Fax: (407) 648-2886
jvc@mooneycolvin.com
slm@mooneycolvin.com
cmm@mooneycolvin.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Kelly K. Moran
Alexandra E. Eisig
1500 Broadway, 16th Floor
New York, NY 10036
(212) 682-3025
Michael Rogovin
476 Hardendorf Ave. NE
Atlanta, GA 30307
(404) 692-7910